UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/20/15

-------------------------------------------------------------------X

ADRIANO VASQUEZ,

               Plaintiff,

      -v.-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.

-------------------------------------------------------------------X

## OPINION AND ORDER

14-CV-7194 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

*Pro se* plaintiff Adriano Vasquez seeks judicial review of a final determination by the

Commissioner of Social Security ("Commissioner"), denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner has

moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), to

which Vasquez submitted no opposition. For the reasons set forth below, the Commissioner's

motion is denied, and the case is remanded to the Commissioner for further proceedings.

## I. BACKGROUND

### A.    Procedural History

Vasquez filed an application for DIB on April 21, 2011, and filed an application for SSI

on May 9, 2011. Administrative Record ("R.") at 144-51, 152-62.[1] Vasquez claimed disability

---

[1]    The administrative record consists of one docket entry with four attached supplemental
documents. (Dkt. Nos. 13 to 13-4). For clarity and consistency, citations to the record will
refer to the pagination that runs sequentially throughout the various entries and is marked in
bold in the lower right-hand corner.

beginning on March 12, 2009 due to depression, polio, and difficulty breathing.[2] *Id.* at 152, 178.

The Social Security Administration ("SSA") denied both of his applications on August 25, 2011.

*Id.* at 62-67. On September 19, 2011, Vasquez filed a request for a hearing before an

Administrative Law Judge ("ALJ"). *Id.* at 70-72. Appearing with an attorney, Vasquez testified

at a hearing before ALJ Zachary Weiss on August 9, 2012. *Id.* at 49-59. The ALJ found that

Vasquez was not disabled and denied his claims in a written decision dated January 11, 2013. *Id.*

at 37-45. The SSA Appeals Council received Vasquez's request for a review of the ALJ's

decision on May 24, 2013, *id.* at 29-30, and denied review on July 3, 2014, *id.* at 1-4, rendering

the ALJ's determination the Commissioner's final decision.

Vasquez timely commenced his action seeking judicial review of the Commissioner's

decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), which he filed on September 5, 2014.

*See* Complaint ("Compl.") (Dkt. No. 1); R. at 1. On March 2, 2015, the Commissioner filed her

Answer and moved for judgment on the pleadings pursuant to Rule 12(c). *See* Notice of Motion

for Judgment on the Pleadings (Dkt. No. 11); Memorandum of Law in Support of Judgment on

the Pleadings ("Def. Mem.") (Dkt. No. 12). While Vasquez sought an extension of time to file

papers in opposition to the motion, which the Court granted (Dkt. No. 17), he ultimately never

submitted any opposition to the motion.

## B.     The Administrative Record

### 1.     Vasquez's Background

Vasquez was born on May 17, 1973, and was 35 years old on the onset date of his alleged

disability. R. at 152. Vasquez lives in the Bronx, has completed the eleventh grade, and speaks

---

2     Though Vasquez originally brought a disability claim under the ailment "difficulty
      breathing," he presented no evidence supporting this claim and his attorney omitted this
      ailment as part of Vasquez's basis for his disability at the hearing. R. at 52.

2

Spanish as his primary language. *Id.* at 283, 313. He is married with four children. *Id.* at 153. In his application, Vasquez described his work history, which includes various positions as a temporary worker and, most recently, working as a forklift operator from 2007 until 2009. *Id.* at 193-99. He stopped working at his most recent job due to mental health issues and his worsening right hand. *Id.* at 52.

Vasquez's claims for DIB and SSI are based on both mental and physical impairments: depression and polio. *Id.* Vasquez has a negative psychiatric history, with no instances of hospitalizations, prior treatment, substance abuse, or assaultive or suicidal behavior. *Id.* at 342. Additionally, Vasquez began experiencing weakness in his right arm at the age of two. *Id.* at 354. Vasquez's arm weakness and atrophy had generally remained stable throughout his life. Though a previous doctor told Vasquez that the cause may be polio, he never received a formal diagnosis as a child. *Id.*

At his hearing and in his submissions to the SSA, Vasquez described his daily activities. *Id.* at 53-55, 185-90. He said that he spends most of the day at home watching television and occasionally goes for walks in a park near his house with his children. *Id.* at 188-89. He is able to take public transportation without assistance. *Id.* at 187. Vasquez also said that he regularly takes his children to and from school, helps his children with homework, and goes grocery shopping with his wife. *Id.* at 185, 188.

## 2. Medical Evidence

### a. Assessment of Mental Health

#### i. Dr. Fernando Taveras's Treatment Notes

Since January 10, 2011, Vasquez has received psychiatric treatment from Dr. Fernando Taveras. *Id.* at 342. His primary complaint was that the disability in his right arm caused him to

3

suffer low self-esteem. *Id.* Vasquez had unremarkable psychiatric, social and developmental, family, and medical histories with no instances of psychiatric hospitalization, medication, or harmful behavior. *Id.* Dr. Taveras initially diagnosed Vasquez with adjustment disorder with depressed mood and prescribed Remeron, an anti-depressant. *Id.*

On February 3, 2011, Vasquez returned to Dr. Taveras with symptoms of depression due to his low self-esteem and inability to find work. *Id.* at 332. Vasquez revealed that he had previously never discussed with anyone his frustrations and feelings of helplessness "due to his lifelong disability." *Id.* at 333. After encouraging Vasquez to "vent," Dr. Taveras evaluated him and found Vasquez sad, yet friendly, attentive, fully communicative, and well-groomed. *Id.* at 332. Though Vasquez was slow to respond, his speech had normal rate, volume, and articulation. *Id.* Vasquez was also coherent and spontaneous in his use of language skills. *Id.* Though his facial expressions and demeanor revealed a depressed mood, his affect matched the topics he discussed. *Id.* Vasquez did not show any indications of psychosis (such as hallucinations, delusions, or bizarre behaviors). *Id.* Dr. Taveras noted that Vasquez could create mental associations and think logically, all with appropriate thought content. *Id.* Vasquez had recurring wishes to die, but did not have suicidal intentions. *Id.* Vasquez's social judgement remained intact with no signs of anxiety, but he was easily distracted. *Id.* Dr. Taveras diagnosed Vasquez with depressive disorder, not otherwise specified ("NOS"). *Id.*

On February 9, 2011, Dr. Taveras noted that Vasquez appeared to be in a better mood. *Id.* at 334. Vasquez told Dr. Taveras that he wanted to return to school to become a social worker and that he would no longer be able to perform any physical activities due to his right arm disability. *Id.* Vasquez seemed friendly, fully communicative, well-groomed, and relaxed, with normal body language and physical behavior. *Id.* Additionally, Vasquez did not appear anxious

4

and had a "normal" mood. *Id.* He denied any suicidal ideas or intentions and showed no signs of psychosis. *Id.* His speech was normal in rate, volume, and articulation. *Id.* Vasquez remained attentive and focused. *Id.*

On February 18, 2011, Vasquez returned to Dr. Taveras for individual therapy. *Id.* at 335. Vasquez described improvement regarding his sense of worthlessness, and stated that he began to love himself more, expressed his determination to continue regular therapy, and denied suicidal thoughts. *Id.* Vasquez was friendly, fully communicative, casually groomed, and relaxed, with normal body language and physical behavior. *Id.* Dr. Taveras observed that Vasquez did not appear anxious. *Id.*

On March 3, 2011, Vasquez reported to Dr. Taveras that he felt "slightly better." *Id.* at 336. However, Vasquez stated that he was living in fear for his family due to the condition of his neighborhood and sought to move them to a different neighborhood. *Id.* Mental status examination findings included normal mood and speech, and appropriate affect of full range. *Id.* Dr. Taveras noted that Vasquez seemed attentive, focused, and capable of good judgment. *Id.*

On April 28, 2011, Vasquez again reported improvement, but also complained about his physical condition preventing him from working certain jobs that require physical force. *Id.* at 337. Vasquez was friendly and fully communicative, but Dr. Taveras also observed that he was "not happy." *Id.* Despite this evaluation, Vasquez was relaxed with a normal mood and no signs of psychotic symptoms. *Id.* Vasquez's speech was normal and he was attentive and focused. *Id.* His affect had a full range and was appropriate. *Id.* His judgment was also still good. *Id.*

On May 23, 2011, Vasquez reported difficulty finding a new home for his family. *Id.* at 338. With his wife undergoing treatment for addiction, Vasquez described needing to serve as both "the mother and the father" for his children. *Id.* Dr. Taveras found Vasquez calm, attentive,

5

fully communicative, and fairly groomed, but also "sad-looking" and unhappy. *Id.* Nevertheless, Vasquez's language skills and associations were intact, but his affect was constricted. *Id.* Vasquez's thinking was logical and thought content was appropriate. *Id.* He denied suicidal ideas and he had no signs of anxiety. Vasquez's insight was normal and his social judgment was intact. *Id.* Dr. Taveras focused the session on helping Vasquez improve on coping issues related to his interpersonal problems. *Id.* at 339.

On October 24, 2011, Vasquez returned to Dr. Taveras, who noted that Vasquez had been regularly attending therapy sessions and taking his medication. *Id.* at 340. Dr. Taveras assessed Vasquez's response to the treatment as "adequate" but with symptoms indicative of a "more advanced mood disorder." *Id.* Dr. Taveras adjusted his diagnosis to rule out adjustment disorder and noted that Vasquez appeared both preoccupied and anxious. *Id.* Vasquez also reported no side effects to treatment with Remeron and Paroxetine. *Id.* Vasquez was calm and attentive, but also unhappy looking. *Id.* Yet his affect was appropriate and of full range and he denied having suicidal thoughts. *Id.* Dr. Taveras spent the session working with Vasquez on coping with depression and interpersonal problems. *Id.* Dr. Taveras recommended continuing Vasquez's prescription of Remeron and Paroxetine.

On March 14, 2012, Vasquez told Dr. Taveras that he was doing better, but also claimed unspecified new emotional and physical complaints. *Id.* at 341. However, Vasquez also reported that his behavior was under control and his mood was less depressed. *Id.* Vasquez was calm, attentive, and fairly groomed. *Id.* His affect was appropriate and congruent with his mood and he had no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychosis. *Id.* Vasquez's associations were normal, he was fully oriented, and his cognitive functioning was adequate. *Id.* He also denied suicidal or homicidal ideas. *Id.* Dr. Taveras affirmed Vasquez's

6

diagnosis of depressive disorder not otherwise specified and recommended that Vasquez

continue taking Remeron and Paroxetine. *Id.*

On December 7, 2012, Dr. Taveras completed a psychiatric report on Vasquez. *Id.* at

245-48. The report described Vasquez's chief complaints as depression and low self-esteem

stemming from his right arm disability. *Id.* at 245. Dr. Taveras assessed Vasquez as continuing to

do "poorly" despite medication. *Id.* Dr. Taveras noted that in his mental status examination

findings from March 14, 2012 Vasquez was calm, attentive, and fairly groomed, with appropriate

affect and congruent mood. *Id.* Vasquez was also coherent and spontaneous with intact language

skills. *Id.* at 246. While there were no signs of attentional issues, Dr. Taveras also noted that

Vasquez was sad-looking with mildly constricted affect. *Id.* Additionally, Dr. Taveras described

him as "downcast." *Id.* at 245. Vasquez's memory was fair-to-good and he had adequate ability

to perform mental functions like calculations and serial sevens. *Id.* at 246. His insight and

judgment were fair and his ability to process information was normal. *Id.* The doctor reported

that, except for limitations due to his right arm, Vasquez's ability to tend to daily activities was

adequate. *Id.* at 247. Vasquez told him that he avoided the presence of others because he was

ashamed of his arm. *Id.* Dr. Taveras stated further that Vasquez's right arm condition limited his

working ability. *Id.*

Additionally, on December 7, 2012, Dr. Taveras completed a medical source statement

questionnaire for Vasquez. *Id.* at 249-51. Dr. Taveras found Vasquez had a moderate ability to

carry out simple instructions.[3] *Id.* Dr. Taveras also found Vasquez markedly limited in his ability

to understand and remember short simple instructions, understand and remember detailed

---

[3]    The Medical Source Statement of Ability to Do Work Related Activities (Mental) defines
       "moderate" to mean that an individual has a moderate limitation but is still able to function
       satisfactorily. R. at 249.

7

instructions, and carry out detailed instructions.[4] *Id.* Furthermore, Dr. Taveras found Vasquez extremely limited in his ability to make judgments on simple work-related decisions.[5] *Id.*

### b. Assessment of Physical Health

#### i. New York Presbyterian Hospital ("NYPH") Treatment Notes

On July 27, 2009, Vasquez visited Dr. Asqual Getaneh at NYPH for a general physical examination. *Id.* at 345-49. Vasquez reported a history of upper extremity paralysis since age two, but that he had no joint pain, numbness, tingling, or anesthesia. *Id.* 346-47. Vasquez reported full mobility in activities of daily living. *Id.* at 347. Upon physical examination, Dr. Getaneh found that Vasquez's right trapezius, shoulder, biceps, triceps, and forearm muscles had atrophied. *Id.* at 348. Dr. Getaneh noted mid-arm circumferences of seven centimeters on the right arm and ten centimeters on the left arm. *Id.* The atrophy was worse at the shoulder and proximal upper extremity. *Id.* Additionally, Vasquez had no extension at the elbow. *Id.* He had reduced strength and range of motion of the right upper extremity. *Id.* at 349. The rest of the doctor's physical examination findings were normal. *Id.* Dr. Getaneh assessed right upper extremity paralysis and referred Vasquez for a neurology consultation. *Id.*

On September 29, 2009, Vasquez visited the neurology clinic at NYPH for his arm weakness. *Id.* at 354-56. Drs. Michael Daras and Rebecca Traub jointly examined Vasquez. *Id.* at 356. Vasquez reported that at the age of two his right arm swelled and weakened without numbness following a vaccination. *Id.* at 354. Vasquez noted that the weakness and atrophy had

---

[4]  The Medical Source Statement of Ability to Do Work Related Activities (Mental) defines "marked" to mean that an individual has a serious limitation with functional ability severely limited, but not precluded. *Id.*

[5]  The Medical Source Statement of Ability to Do Work Related Activities (Mental) defines "extreme" to mean that the individual has a major limitation with no useful ability to function. *Id.*

8

been stable for his entire life, but was uncertain about the cause. *Id.* He stated that a prior doctor

suggested that he had polio, but no testing was ever done to confirm the diagnosis, and it was not

a diagnosis he received as a child. *Id.* A physical examination found him in no acute distress, but

with reduced strength and atrophy in the right arm, greater in the proximal than distal. *Id.* at 355.

His left arm and legs had normal bulk, tone, and full strength. *Id.* His gait was normal, but his

reflexes were absent in the right arm. *Id.* Mental status examination findings described Vasquez

as awake, alert, and oriented with fluent speech. *Id.* Drs. Daras and Traub diagnosed Vasquez

with monoparesis.[6] *Id.* at 356. They referred him to physical therapy and a somatosensory

evoked potentials ("SSEP") assessment to differentiate between plexitis and polio as potential

causes.[7] *Id.*

On January 28, 2010, Vasquez returned to Dr. Getaneh for a follow-up examination. *Id.*

at 357-58. His chief complaint was right shoulder pain. *Id.* at 357. Vasquez stated that he had lost

his referral to physical therapy and was unable to undergo the SSEP because his insurance did

not cover it. *Id.* at 358.

On January 29, 2010, an electromyography ("EMG") and nerve conduction studies

revealed abnormal findings, including electrophysiologic evidence of a right plexopathy

predominantly affecting the upper cord. *Id.* at 403-04. There was no evidence of generalized

neuropathy, radiculopathy, or myopathy. *Id.* at 404.

On April 19, 2010, Vasquez met with Yvonne Valle, a social worker at NYPH. *Id.* at

---

[6]    Monoparesis refers to the partial loss of voluntary motor abilities in a single limb.
*Monoparesis*, MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND
ALLIED HEALTH (7th ed. 2003), http://medical-dictionary.thefreedictionary.com/monoparesis.

[7]    Brachial Plexitis ("plexitis") refers to damage to the brachial plexus, a network of nerves that
connects the spine to the arms. *Brachial Plexus and Its Injury*, MEDCHROME MAGAZINE,
(Feb. 16, 2013), http://medchrome.com/basic-science/anatomy/bracial-plexus-and-its-injury.

9

360-63. Valle reported that Vasquez was independent in his physical functioning, including his activities of daily living. *Id.* at 361. The social worker determined that Vasquez's level of overall intellectual functioning was average and that he was both fully oriented and cooperative. *Id.* at 362. Valle also reported that Vasquez's affect was anxious, but that his insight, judgment, and memory were good. *Id.* Vasquez lacked mobility in the right arm and was self-conscious about it. *Id.*

On September 21, 2010, NYPH psychiatrist Dr. Daniel Pilowsky evaluated Vasquez. *Id.* at 364-65. Vasquez reported insomnia, approximately twice weekly, sadness one-to-two times a week, and variable appetite. *Id.* at 364. Vasquez's energy and concentration were not affected, but his sadness stemmed from his inability to find a job and fear of rejection attributed to his right arm. *Id.* Dr. Pilowsky was unsure why Vasquez had become so preoccupied with his right arm and noted that Vasquez had worked for nine years without fixating on his right arm, although the doctor noted that Vasquez's right arm harmed his self-esteem. *Id.* Dr. Pilowsky speculated that Vasquez's preoccupation with his right arm condition was an unhealthy way of coping with his inability to find work and his wife's ongoing treatment for substance abuse. *Id.* at 364-65. A mental status examination revealed that Vasquez was calm and cooperative and spoke in a relevant and coherent manner. *Id.* at 365. His thinking was goal-directed and logical, although he perseverated on his arm. *Id.* Vasquez's affect was appropriate to ideation and his cognition and memory were grossly intact. *Id.* Dr. Pilowsky diagnosed dysthymia, prescribed Trazodone, and referred Vasquez to a mental health clinic.[8] *Id.*

---

[8]   Dysthymic disorder ("dysthymia") is "emotional depression that persists for years, usually with no more than moderate intensity." *Dysthmic Disorder*, BEHAVENET, http://behavenet.com/dysthmic-disorder (last visited July 20, 2015). In the most recent version of the diagnostic manual DSM-V, dysthymic disorder has been renamed "persistent depressive disorder." John M. Grohol, *DSM-5 Changes: Depression & Depressive*

On October 15, 2010, Vasquez returned to social worker Yvonne Valle. *Id.* Valle "strongly recommended" that Vasquez follow through with his psychiatric appointments to help with current stressors, specifically on the issue of seeking employment. *Id.*

On October 25, 2011, Vasquez visited the emergency department chiefly complaining of right chest pain for two days. *Id.* at 367. Attending physician Dr. Enid Coleman noted that Vasquez had atrophy in the right arm with a minimal range of motion, and that his pain increased whenever he moved his arm or turned his torso *Id.* at 370. She assessed Vasquez with muscle pain, prescribed Naprosyn, and discharged him the same day with instructions to follow up with his primary care physician. *Id.* at 371-72. An electrocardiogram ("EKG") performed on that date revealed normal findings. *Id.* at 379-80.

On November 9, 2011, Vasquez returned to Dr. Getaneh for a follow-up visit. *Id.* at 373-74. Vasquez reported that his chest pain had resolved. *Id.* at 374. Dr. Getaneh assessed Vasquez as having dysthymia and atrophy with poliomyelitis.[9] *Id.* at 374, 407. Dr. Getaneh also stated that it was "not clear if this is completely disabling" and that Vasquez's condition would need further evaluation to determine the extent of his disability. *Id.* at 374.

### ii. Federation Employment & Guidance Service Treatment Notes

On April 29, 2011, Vasquez visited an organization called Federation Employment &

---

*Disorders*, PSYCHCENTRAL, (May 18, 2013), http://pro.psychcentral.com/dsm-5-changes-depression-depressive-disorders/004259.html.

[9] Both "Polio" and "Poliomyelitis" refer to the same condition: an infectious disease that results in neurological degeneration of muscle tissue, with muscle atrophy and paralysis. *Poliomyelitis*, WORLD HEALTH ORGANIZATION (Oct. 2014), http://http://www.who.int/mediacentre/factsheets/fs114/en.

Guidance Service ("FEGS") for an evaluation of his disability by social workers.[10] *Id.* at 258-64. Vasquez reported right-arm paralysis and weakness since childhood due to polio, which had worsened and spread to his left arm over the previous two years.[11] *Id.* at 259-60. He also reported that he had recently developed depression and started therapy. *Id.* at 260. A physical examination revealed muscle atrophy in the right upper extremities with abnormal muscle bulk, power, and tone. *Id.* at 262. Additionally, Vasquez's right arm demonstrated an absence of reflexes. *Id.* at 262. The mental health examination indicated mild depression, but also advised further assessment by physicians. *Id.* at 258.

On May 10, 2011, Vasquez returned to FEGS to receive a final diagnosis. *Id.* at 262-63. Vasquez received a diagnosis of depressive disorder, but this diagnosis was labeled as "unstable," meaning prone to change or worsening. *Id.* Vasquez also received a diagnosis of "other paralytic symptoms," although this diagnosis was also labeled as "unstable." *Id.* at 263.

On August 3, 2011, FEGS prepared a biopsychosocial summary of Vasquez. *Id.* 276-99. The summary noted that Vasquez lived in an apartment with his domestic partner and four children. *Id.* at 279-82. Vasquez reported that he was diagnosed with depression in January 2011, but he denied suicidal or homicidal ideations or hallucinations. *Id.* at 287. He stated that he felt depressed more than half the days in the past two weeks and experienced little interest or pleasure in doing things. *Id.* at 287-88. He also stated that he had trouble either falling or staying asleep or sleeping too much, feeling tired or having little energy, poor appetite or overeating,

---

[10]   FEGS, is a non-profit organization, funded by the New York City Human Resources Administration, which provides a variety of health and human services, including helping individuals to obtain employment or federal disability benefits. *See* http://www.fegs.org/about/about_fegs (last visited February 27, 2015).

[11]   Vasquez's claims about left arm weakness are not supported by any other evidence in the medical record.

feeling bad about himself or that he was a failure, trouble concentrating, and moving or speaking slowly or feeling restless for several days in the past two weeks. *Id.* Additionally, Vasquez reported that he was able to perform activities of daily living, including cleaning and tidying the home, grooming himself, shopping for groceries, cooking meals, reading, socializing, getting dressed, and watching television. *Id.* at 289.

### iii. Consultative Examiners and State Agency Consultants

On August 5, 2011, Dr. William Lathan performed an internal consultative examination of Vasquez. *Id.* at 309-12. The examination results noted that Vasquez was diagnosed with polio at the age of two and that his primary problem was atrophy of the right arm. *Id.* at 309. It also noted that Vasquez began treatment for depression in May 2011, and that he was cooperative and appropriate in dress and affect during the examination. *Id.* His current medications included Mirtazapine and Lexapro. *Id.* Vasquez could perform all activities of personal care, but he reported that others performed the cooking, cleaning, laundry, and shopping for him.[12] *Id.*

Upon physical examination, Dr. Lathan found Vasquez in no acute distress and with normal gait and stance. Vasquez had full range of motion of the left shoulder, elbow, forearm, and wrist. *Id.* at 310-11. However, Vasquez's right shoulder was abducted and elevated approximately 10 degrees greater than it should have been. *Id.* at 311. And although Vasquez's right elbow flexion was normal at the joint, the elbow could only extend to a maximum of 45 degrees. *Id.* Additionally, his right wrist could only bend upward to a maximum of five degrees and his fingers could only flex 30 degrees upon palm stimulation. *Id.* Despite the fact that Vasquez had full (5/5) strength in the left upper and bilateral lower extremities, he had reduced (3/5) strength in the proximal right upper extremity. *Id.*

---

[12] Though Vasquez's wife regularly performs the above mentioned household tasks, he still has the ability to perform those same tasks himself. R. at 289.

13

Dr. Lathan assessed history of polio, right upper extremity paresis, and history of depression. *Id.* at 311. In a medical source statement, the doctor opined that Vasquez had severe restrictions to lifting, carrying, pushing, pulling, reaching, and grasping with the right upper extremity. *Id.*

That same day, psychiatrist Dr. Herb Meadow performed a psychological consultative examination of Vasquez. *Id.* at 313-16. Vasquez reported difficulty falling asleep. *Id.* He also stated that his appetite was poor and that he had lost weight in the past year, but was unsure how much. *Id.* He described depressive symptoms such as dysphoric moods, irritability, low energy, diminished self-esteem, and difficulty concentrating. *Id.* But even though Vasquez stated that he was depressed because he could not work, he was never suicidal. *Id.* And though he reported anxiety at times, he denied panic attacks, manic symptoms, thought disorder, or cognitive deficits. *Id.* Vasquez also reported that his wife performed all of the household chores, but he took care of his personal hygiene. *Id.* at 315. He said that he socialized primarily with his immediate family and he spent his time watching television and listening to music. *Id.*

Dr. Meadow noted that Vasquez had a cooperative demeanor and an adequate manner of relating. *Id.* at 314. His thought processes were coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia. *Id.* Vasquez's attention and concentration were intact for counting, calculations, and serial threes from twenty. *Id.* Dr. Meadow diagnosed adjustment disorder with depressed mood and recommended that Vasquez continue with his psychiatric treatment. *Id.* In a medical source statement, Dr. Meadow opined that Vasquez could perform all tasks necessary for vocational functioning. *Id.*

On August 19, 2011, State Agency psychological consultant Dr. Edward Kamin reviewed the record and completed a psychiatric review technique ("PRT") form, assessing Vasquez's

14

mental limitations against the requirements of Listing 12.04 of 20 C.F.R. Part 404, Subpart P,
Appendix 1. *Id.* at 317-30. Rating the paragraph B criteria of the listings in the PRT, Dr. Kamin
concluded that Vasquez's mental impairments caused no limitations in his activities of daily
living, social functioning, concentration, persistence, or pace. *Id.* at 327. The doctor further
found that Vasquez had not experienced repeated episodes of deterioration. *Id.* at 327-28. Dr.
Kamin ultimately concluded that Vasquez's depression was a non-severe impairment. *Id.* at 317.

### 3.    Non-Medical Evidence

On May 25, 2011, Vasquez completed a report on his functional abilities, as required by
the New York State Office of Temporary and Disability Assistance. *Id.* at 183-92. Vasquez noted
that he lived in an apartment with his family. *Id.* at 184. He took his son to school in the morning
and picked him up in the afternoon. *Id.* at 185. He helped his son with homework when he was
not depressed. *Id.* He also had no problems with personal care and he did not need reminders to
take his medication. *Id.* at 185-86. He reported that his wife prepared his meals. *Id.* at 186. He
was able to go outside alone and use public transportation. *Id.* at 187. Vasquez shopped in stores
with his wife and took his children to the park. *Id.* at 188-89. He had no problems getting along
with friends, family, bosses, or other people. *Id.* at 189-90. He had no difficulty paying attention,
could finish what he started, and could follow written and spoken instructions. *Id.* at 190.
However, Vasquez also stated that he could not use his right arm. *Id.* at 189.

### 4.    Hearing Before the ALJ

At the hearing before ALJ Weiss on August 9, 2012, Vasquez appeared with counsel and
both he and vocational expert Loren Sustar testified. *Id.* at 49-59. As to his physical impairments,
Vasquez testified that his muscles shrank and he lost strength in his arms when he worked. *Id.* at
52. He claimed that his body hurt and he lost strength in his legs from standing too much. *Id.*

15

Vasquez testified that he only used his right hand to hold onto objects. *Id.* at 54. As to his mental impairments, Vasquez also testified that he was depressed because he was unable to work. *Id.* at 53. However, he testified that he cared for his children, ages six, seven, nine, and twelve, by bathing them, taking them to and picking them up from school, and reading to them. *Id.* at 53-54.

Sustar also testified at the hearing. *Id.* at 55-59. She testified that Vasquez's past relevant work included being a forklift operator, which he performed at the light exertion level, and an order picker, which he also performed at the light exertion level. R. at 56. The ALJ asked Sustar to consider a hypothetical individual with the same age, education, and work experience as Vasquez. *Id.* at 57. The ALJ limited the hypothetical individual to someone who could only occasionally lift five pounds and who performed unskilled work that involved only routine, repetitive tasks, with only occasional contact with the public and coworkers. *Id.* at 57-58. The expert testified that such an individual could perform unskilled light work in representative occupations such as school bus monitor, messenger, and school crossing guard. *Id.* at 57-58.[13]

### 5.   Submissions to the Appeals Council

On May 24, 2013, with the assistance of counsel, Vasquez appealed the ALJ decision. *Id.* at 29-30. As part of the appeals process, Vasquez submitted a letter dated May 2, 2014 from physical therapist Marlfe Nina Taguinay in support of his appeal. *Id.* at 10. Additionally, Vasquez submitted letters from physical therapist Mary Claire Arbilo (dated July 24, 2013), Dr. Sara Rostanski of NYPH (dated July 17, 2013), and Dr. Taveras (dated July 25, 2013) after filing his appeal. *Id.* at 20-22.

Ms. Arbilo stated that Vasquez began treatment in her office on June 15, 2013 for lower

---

[13]   Sustar testified that there are 1,100 school bus monitor jobs in New York City and 79,000 jobs nationally; 6,000 messenger jobs in New York City and 80,000 jobs nationally; and 1,200 school crossing guard jobs in New York City and 50,000 jobs nationally. R. at 57-58.

16

back pain, limitation of motion of the lumbosacral spine, tenderness and muscle spasm of the

paralumbar, and difficulty with bending, carrying, and lifting. *Id.* at 20. Dr. Rostanski stated that

Vasquez was being treated for monoplegia of the right arm and that he had proximal weakness in

that arm. *Id.* at 21. Finally, Dr. Taveras stated that Vasquez was being treated for depressive

disorder and was prescribed Remeron and Citalopram. *Id.* at 22. On July 3, 2014, the Appeals

Council denied Vasquez's request for review of the ALJ decision. *Id.* at 1. In denying the

request, the Appeals Council reviewed Vasquez's more recent submissions, but concluded that

they did not affect the ALJ's decision (which covered whether Vasquez was disabled before

January 11, 2013). *Id.* at 2.

## II. **DISCUSSION**

### A.    **Legal Standards**

#### 1.    **Judicial Review of Commissioner's Determination**

An individual may obtain judicial review of a final decision of the Commissioner in the

"district court of the United States for the judicial district in which the plaintiff resides."

42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision

applied the correct legal standards and whether the decision is supported by substantial evidence.

*Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v.*

*Perales*, 402 U. S. 389, 401 (1971)) (internal quotation marks and alterations omitted). In

weighing whether substantial evidence exists to support the Commissioner's decision, "the

reviewing court is required to examine the entire record, including contradictory evidence and

evidence from which conflicting inferences can be drawn." *Id.* at 417 (quoting *Mongeur v.*

*Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court

may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding the

case for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to

inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings

would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No.

06-CV-4861 (ARR), 2008 WL 267429, at \*8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d

at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v.*

*Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not

to substitute its own judgment for that of the Commissioner, even if it might justifiably have

reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683

(S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation

marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject

those facts 'only if a reasonable factfinder *would have to conclude otherwise.*'" *Brault*, 683 F.3d

at 448 (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42

U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the

individual] is not only unable to do his previous work but cannot, considering his age, education,

18

and work experience, engage in any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In general, when assessing a claimant's impairments and determining whether they meet

the statutory definition of disability, the Commissioner "must make a thorough inquiry into the

claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be

broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of

H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)); *see Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir.

1988). Specifically, the Commissioner's decision must take into account factors such as: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations

omitted).

### a.   Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry.

*Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013) (quoting *Perez v. Chater*, 77 F.3d 41,

46 (2d Cir. 1996)). First, the Commissioner must establish whether the claimant is presently

employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the

Commissioner determines whether the claimant has a "severe impairment" restricting his ability

to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the

Commissioner moves on to the third step, considering whether the claimant has an impairment

that is listed in Appendix 1 to 20 C.F.R. § 404, Subpt. P (a "Listing"). 20 C.F.R.

§ 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R.

§ 404.1520(d). If not, the Commissioner continues on to the fourth step, determining whether the

19

claimant has the residual functional capacity ("RFC") to perform his past relevant work. 20

C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past

relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant

possesses the ability to perform any other work, 20 C.F.R. § 404.1520(a)(4)(v), typically by

relying on the applicable medical vocational guidelines, known as the "Grids." *See Woodmancy

v. Colvin*, 577 Fed.Appx. 72, 75 (2d Cir. 2014) ("[T]he ALJ may rely on the medical vocational

guidelines (the 'grids') to adjudicate the claim.").

The claimant bears the burden of proving disability in steps one through four of the

sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is

successful, the burden shifts to the Commissioner on the fifth and final step, where she must

establish that the claimant has the ability to perform some work in the national economy. *See

Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530

U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must

on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-

adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

(internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate

the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete

medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d

Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)). This responsibility "encompasses not only the

duty to obtain a claimant's medical records and reports but also the duty to question the claimant

20

adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at \*8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has met his duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at \*12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at \*3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). This imperative remains in force even where the claimant is represented by counsel. *Perez*, 77 F.3d at 47.

It is well-settled that the ALJ has an affirmative duty to develop the record in a disability benefits proceeding and that remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran*, 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); *Rosa*, 168 F.3d at 83 (remand appropriate where ALJ, *inter alia*, failed to obtain adequate information from treating physician and to seek potentially relevant information from other doctors and treatment facilities); *Rodriguez*, 2003 WL 22709204, at \*3 ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citation omitted).

21

### c.   Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at \*14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). However, a treating physician's opinion is given controlling weight—that is, it is binding—provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Selian*, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citing *Burgess*, 537 F.3d at 128 and *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003)). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

Under certain circumstances, however, a treating physician's opinion will not be controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*,

22

No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(l), 416.927(e)(l)); *accord Rosier v. Colvin*, 586 Fed.Appx. 756, 758 (2d Cir.

2014) ("[T]reating physician's statement that the claimant is disabled cannot itself be

determinative.") (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). Additionally, where

"the treating physician issued opinions that [were] not consistent with other substantial evidence

in the record, such as the opinion of other medical experts, the treating physician's opinion is not

afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v.*

*Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in

original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion

is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has

an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating

physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional

information from treating physician *sua sponte* if clinical findings are inadequate). As a result,

"the 'treating physician rule' is inextricably linked to the duty to develop the record. Proper

application of the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these

opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN),

2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician]

rule is robust.") *adopted by*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must

consider several factors that have been enumerated by the Second Circuit:

(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining the appropriate weight does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited"); *Schaal*, 134 F.3d at 505; 20 C.F.R. § 404.1527(d)(2)).[14] The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician's opinion. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, courts "have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (alteration in original) (internal quotation marks omitted).

The courts leave it to the finder of fact to resolve any conflicts there may be in the medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). A court may not substitute its own judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings

---

[14] On March 26, 2012, a portion of 20 C.F.R. § 404.1527 was modified. The section that described the factors for an ALJ to consider when deciding how to weigh a treating physician's opinion was moved from subsection (d)(2) to (c)(2).

24

supported by evidence having rational probative force." *Id.* (quoting *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)).

### d.   Claimant's Credibility

As to the credibility of a claimant, here too, the reviewing court must defer to an ALJ's findings. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine that there are 'medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain.'" *Vargas v. Astrue*, No. 10-CV-6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Snell*, 177 F.3d at 135 and 20 C.F.R. § 404.1529(a)). So long as the "findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte v. Sec'y of Health and Human Servs. of the United States*, 728 F.2d 588, 591 (2d Cir. 1984)). However, these findings must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams*, 859 F.2d at 260-61).

Because subjective statements about symptoms alone may not establish a disability, the ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must weigh whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If the answer to the first step of the analysis is yes, the ALJ proceeds to the second step, considering "the extent to which [the claimant's] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence of record." *Id.* (citing 20

C.F.R. § 404.1529(a)) (internal quotation marks omitted). Because "an individual's symptoms

can sometimes suggest a greater level of severity of impairment than can be shown by the

objective medical evidence alone," the ALJ may take into account a variety of other

considerations as evidence. *Pena*, 2008 WL 5111317, at \*11 (citing SSR 96-7p, 1996 WL

374186, at \*3 (SSA July 2, 1996)). These include: a claimant's daily activities; the location,

duration, frequency, and intensity of the claimant's pain or other symptoms; factors that

aggravate the symptoms; treatment and medication necessitated by the pain or other symptoms

and their effects; other alleviating measures taken by the claimant; and other factors that relate to

the claimant's functional limitations and restrictions stemming from pain or other symptoms. *Id.*

**B.    The ALJ's Decision**

    In a decision dated January 11, 2013, the ALJ determined that Vasquez was not disabled

as defined by the Social Security Act and applicable regulations, and therefore denied Vasquez's

claims for DIB and SSI. R. at 37-45. Following the five-step inquiry into disability, the ALJ first

determined that Vasquez had not been engaged in substantial gainful activity since March 12,

2009, the onset date of Vasquez's disability. *Id.* at 39. At step two, the ALJ found that Vasquez

had the severe impairments of depression and a history of polio. *Id.* At step three, the ALJ

determined that neither of these impairments met or was medically equal to the severity of a

Listing. *Id.* at 40.

    The ALJ then moved on to step four and found that Vasquez had the RFC for light work

as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but was limited to routine repetitive

tasks and occasionally lifting five pounds. *Id.* at 41-43. Additionally, the ALJ determined that

Vasquez did not have the RFC to perform his past work as a forklift operator. *Id.* at 43. The ALJ

found that Vasquez's statements about his disability's intensity, persistence, and limiting effects lacked support from the medical evidence. *Id.* at 43. Finally, at step five, with reference to the Grids, the ALJ determined that, given his age, language ability, job skills, education, work experience, and RFC, there were a significant number of jobs in the national economy Vasquez could perform. *Id.* at 44.[15]

## C.   Analysis

Although Vasquez, who is proceeding *pro se*, has not submitted any opposition to the Commissioner's motion, the Court liberally construes his complaint to raise the strongest arguments it suggests, specifically that the ALJ did not comply with the applicable legal standards and made a determination that was not supported by substantial evidence. *See, e.g., Wellington v. Astrue*, No. 12-CV-3523 (KBF), 2013 WL 1944472, at \*2 (S.D.N.Y. May 9, 2013). Vasquez's form complaint uses the boilerplate language alleging that the ALJ's decision was not supported by substantial evidence. Compl. at ¶ 9. The Court takes this general allegation specifically to challenge the ALJ's determinations at steps three through five which, unlike steps one and two, were decided in the Commissioner's favor.

Upon review of the record, the Court finds that, while there is substantial evidence to support the ALJ's step three determination, in reaching his RFC conclusion at step four, the ALJ failed to engage in the required analysis of Vasquez's limitations. Because the Court is remanding the case for this deficiency, it need not review the ALJ's analysis at step five. *See Serrano v. Colvin*, No. 12 CV 7485 (PGG) (JLC), 2014 WL 197677, at \*18 (S.D.N.Y. Jan. 17, 2014) (holding that where ALJ's errors at earlier steps require remand, step five analysis is unnecessary), *adopted* May 7, 2014 (Order Dkt. No. 22). Additionally, since the record has been

---

[15]   The "Grids" are found in 20 C.F.R. § 404, Subpt. P, Appx. 2. Table 2 of the Grids is applicable where a claimant has the RFC to perform light work.

re-opened, the ALJ can consider additional evidence submitted since his initial decision. *See,*
*e.g.*, *McClain v. Barnhart*, 299 F. Supp. 2d 309, 311 (S.D.N.Y. 2004). Accordingly, the Court
orders that the case be remanded, and upon rehearing the case the ALJ should consider the new
evidence Vasquez submitted to the Appeals Council in order to evaluate his alleged disability on
a complete record.

### 1.    The ALJ's Step Three Determination is Supported by Substantial Evidence

At step three, the ALJ concluded that Vasquez did not have an impairment or
combination of impairments that met or medically equaled a Listing. *Id.* at 39. Though the ALJ
discussed the Listing for mental disorders (Listing 12.00) in detail, the ALJ summarily held that
Vasquez did not meet a Listing as to his disorder stemming from polio (Listing 11.00).[16]

#### a.    Polio (or Poliomyelitis)

Though not explored in depth by the ALJ, his conclusion that Vasquez's polio did not
meet the criteria for a Listing is supported by substantial evidence. To qualify as a listed
impairment, neurological disorders, including poliomyelitis, require evidence of any of the
following:

   a. Persistent difficulty with swallowing or breathing; or
   b. Unintelligible speech; or
   c. Significant and persistent disorganization of motor function in two extremities,
      resulting in sustained disturbance of gross and dexterous movements, or gait and
      station.

20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 11.11.

First, there is no evidence to suggest that Vasquez had persistent difficulty with
swallowing or breathing. Although he was hospitalized on October 25, 2011 for two days due to

---

[16]  With respect to polio, a claimant must be impaired in two extremities. Although Vasquez at
one point complained of left arm weakness, this complaint was not supported by any
evidence in the record. *See supra* note 11.

right chest pain, Vasquez was released with medication, and when he returned to the hospital in

November, he reported that his chest pain had resolved. R. at 370-74. There are no other

instances of chest pain and breathing difficulties in the record. Secondly, there is no evidence

that Vasquez had difficulty speaking clearly. In fact, Dr. Taveras's treatment notes indicate that

Vasquez was "fully communicative" on multiple occasions throughout his period of disability.

*Id*. at 332-41. Finally, both Dr. Lathan and Dr. Getaneh noted that Vasquez's motor function

difficulties are limited to his right arm with no other extremities mentioned as polio-stricken. *Id*.

at 310-11, 408.

### b. Depression

The ALJ's conclusion that Vasquez's depression did not meet the criteria for a Listing is

also supported by substantial evidence. To qualify as a listed impairment, affective disorders,

including depression, require evidence that a claimant's disorder meets either both Paragraph A

and B requirements or Paragraph C requirements. 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 12.04.

Paragraph A for depressive disorder refers to continuous or intermittent persistence of any four

of the following:

   a. Anhedonia or pervasive loss of interest in almost all activities; or
   b. Appetite disturbance with change in weight; or
   c. Sleep disturbance; or
   d. Psychomotor agitation or retardation; or
   e. Decreased energy; or
   f. Feelings of guilt or worthlessness; or
   g. Difficulty concentrating or thinking; or
   h. Thoughts of suicide; or
   i. Hallucinations, delusions, or paranoid thinking.

*Id.* at § 12.04(A)(1). Paragraph B refers to results of any two of the following:

   a. Marked restriction of activities of daily living; or
   b. Marked difficulties in maintaining social functioning; or
   c. Marked difficulties in maintaining concentration, persistence, or pace; or
   d. Repeated episodes of decompensation, each of extended duration.

29

*Id.* at § 12.04(B). Paragraph C refers to a medically documented history of a chronic affective

disorder of at least two years in duration that has caused more than a minimal limitation of

ability to do basic work activities, with treatment or medication attenuating the symptoms, and

one of the following:

- a. Repeated episodes of decompensation, each of extended duration; or
- b. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
- c. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.* at § 12.04(C). Evidence in the record of loss of interest in activities, difficulty sleeping,

feelings of worthlessness, and trouble concentrating suggests that Vasquez suffers from a

documented persistence of depressive disorder that meets Paragraph A requirements. R. at 287-

88. However, his resulting impairment is not marked enough to meet the Listing criteria under

Paragraph B. Additionally, Vasquez's condition fails to meet Paragraph C criteria.

First, there is no evidence in the record to demonstrate that Vasquez meets the Listing

criteria for Paragraph B. As for the first criterion, Vasquez does not have a marked restriction in

his daily living activities based on descriptions provided by both him and his therapist. During

Vasquez's visit to FEGS, he reported that he was able to wash dishes, wash clothes, sweep/mop

the floor, vacuum, make beds, shop for groceries, cook meals, read, socialize, get dressed, bathe,

use the toilet, groom himself, and watch television. *Id.* at 289. Also, Dr. Taveras described

Vasquez's ability to care for himself in such activities as "fairly adequate," except where he must

rely on his right arm. *Id.* at 247. These reports match consultative examiner Dr. Lathan's

analysis, which found Vasquez capable of performing "all activities of personal care." *Id.* at 309.

Therefore, Vasquez fails to meet the first criterion.

30

As for the second criterion, though Vasquez suffers from moderate difficulties in social functioning, he does not suffer from marked difficulties.[17] Although Dr. Taveras reported that Vasquez suffered from self-esteem issues due to his arm condition, he could still interact with Dr. Taveras in a cooperative and socially functional manner. *Id.* at 331-42. Additionally, based on his own examination, the consultative psychologist Dr. Kamin also concluded in the PRT that Vasquez did not have difficulty in maintaining social functioning. *Id.* at 327. Therefore, Vasquez fails to meet the second criterion.

As for the third criterion regarding concentration, persistence, or pace, Dr. Taveras described a largely marked impairment, stating that Vasquez's ability to deal with stress was poor and that he responds with poor understanding. *Id.* at 249. Therefore, Vasquez does meet the third criterion.

As for the fourth criterion, there is no evidence in the record to suggest that Vasquez has ever gone through an extended period of decompensation.[18] *Id.* at 327. While Dr. Taveras reported working with Vasquez on his stress coping skills, he did not report any significant personality shifts or personality breakdowns related to Vasquez's coping difficulties. *Id.* at 338. Therefore, Vasquez fails to meet the fourth criterion. With only enough evidence to suggest that Vasquez meets the third criterion for Paragraph B, Vasquez does not meet the Listing criteria with a combination of Paragraph A and Paragraph B factors.

Additionally, there is no evidence in the record to suggest that Vasquez meets the Listing

---

[17]   *See* R. at 249.

[18]   Decompensation is the "failure to generate effective psychological coping mechanisms in response to stress, resulting in personality disturbance or disintegration, especially that which causes relapse in schizophrenia." OXFORD AMERICAN COLLEGE DICTIONARY, http://www.oxforddictionaries.com (last visited July 20, 2015).

criteria for Paragraph C. As previously indicated, Vasquez has no history of decompensation. *Id.* Additionally, there is no evidence to suggest that Vasquez's depression could be predicted to cause decompensation in the future. Finally, there is no evidence in the record that Vasquez lives in a "highly supportive living environment."[19] The record does not contain any evidence suggesting that Vasquez required a monitored living arrangement equivalent to a hospital or a halfway house. In fact, the record indicates that Vasquez has never been hospitalized for his depression. *Id.* at 185, 188.

Finally, the ALJ's step three analysis receives support from substantial evidence in the record. Dr. Taveras's treatment notes, Dr. Getaneh's treatment notes, reports by consultative physicians, and Vasquez's own statements all indicate that Vasquez's alleged impairments do not rise to the level of severity necessary to meet a Listing that would require a finding of disability at step three. Therefore, the ALJ did not err in his analysis of step three.

### 2. The ALJ Failed to Fully Develop the Medical Record at Step Four

Nevertheless at step four, the ALJ failed to fully develop the record regarding the opinions of Dr. Taveras and Dr. Getaneh, Vasquez's treating psychologist and primary care physician, respectively. This failure prevented the ALJ from evaluating Vasquez's RFC at step four on a complete record. Dr. Taveras diagnosed Vasquez with depressive disorder, NOS that would interfere with his ability to work, and assessed Vasquez as "unable to respond adequately to interactive and work pressure." *Id.* at 250. Dr. Getaneh diagnosed Vasquez with right arm atrophy and poliomyelitis and wrote a letter on his behalf requesting that "necessary assistance" be extended to Vasquez. *Id.* at 407.

---

[19]   A highly supportive living environment is a structured environment similar to a hospital, halfway house, board and care facility, or other such environment to manage chronic mental disorders or overt symptoms. 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 12.00(F).

Specifically, the ALJ failed to develop the record in two ways: (1) the ALJ gave less

weight to Dr. Taveras's opinion without good reasons for his assessment; and (2) the ALJ failed

to identify and weigh Dr. Getaneh's opinion as that of a treating physician. R. at 43. The Court

thus finds that the ALJ erred in his RFC determination at step four by failing to fully develop the

record.

### a.      The ALJ Erred in Failing to Provide Good Reasons for Affording Less Weight to Dr. Taveras's Opinion

In evaluating Dr. Taveras's opinion, the ALJ did not provide good reasons for affording it

less weight.[20] Specifically, the ALJ determined that Dr. Taveras primarily evaluated Vasquez's

mental state and therefore improperly relied on Vasquez's physical conditions when reaching his

conclusions. R. at 43. Thus, the ALJ decided to afford less weight to Dr. Taveras's treating

physician opinion. *Id*. In the Second Circuit, the ALJ must analyze treating physicians' opinions

along enumerated factors to reach good reasons for assigning weight to them: (a) examining

relationship; (b) treating relationship; (c) supportability; (d) consistency; (e) specialization; and

(f) other factors. *See Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c). Here, the ALJ failed to

properly analyze the supportability of Dr. Taveras's opinion. The more a medical source presents

relevant evidence to support an opinion and the better an explanation a source provides, the more

weight the opinion should receive. 20 C.F.R. § 404.1527(c)(3). In his decision, the ALJ

acknowledged only that Dr. Taveras's assessment of Vasquez's disability was based on

Vasquez's right arm condition, which Dr. Taveras never treated. R. at 43. The ALJ then

proceeded to give less weight to Dr. Taveras's opinion with no further explanation. *Id.* The ALJ,

---

[20] A "good" reason means an "adequate" reason, because the term describes whether a sufficient standard is met by the ALJ's reasoning. *See, e.g.,* 20 C.F.R. 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *see also Scott*, 2010 WL 2736879, at *17.

however, failed to clarify whether Dr. Taveras mentioned the condition of the right arm to comment directly on Vasquez's physical capabilities or instead simply to comment on how Vasquez's depression was intricately tied to his obsession with his right arm disability.

The ALJ's failure to seek clarification regarding Dr. Taveras's opinion as to Vasquez's right arm was a failure to complete the record. *See Schaal*, 134 F.3d at 505. There is evidence in the record to suggest that Dr. Taveras discussed Vasquez's right arm in the context of Vasquez's depression and not his physical capabilities. Dr. Taveras's treatment records connect Vasquez's arm condition with his feelings of hopelessness on multiple occasions. *Id.* at 332-33, 337, 342. Dr. Taveras described Vasquez's chief complaint as "low self-esteem due to disability in his right arm." *Id.* at 342. In fact, the ALJ failed to note that Dr. Pilowski's psychological evaluation, which states that "[w]hat is clear… is that the malfunctioning right arm has damaged [Vasquez's] self-esteem," independently supports the interpretation that Dr. Taveras's opinion as to Vasquez's right arm related solely to his mental capabilities. *Id.* at 364. It is also possible that Dr. Taveras improperly assessed Vasquez's physical work capabilities based on the condition of his right arm. *Id.* at 247. But that remains uncertain on the present record. In any event, the ALJ failed to address gaps in the record when he did not seek clarification from Dr. Taveras as to whether his assessment of Vasquez's work ability was based on his physical or mental limitations. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999) (finding error when ALJ failed to give treating physicians opportunity to supplement their submissions where appropriate).

The ALJ's decision also demonstrates that he failed to consider the required factors in according Dr. Taveras's opinion less than controlling weight, specifically the supportability of Dr. Taveras's opinion, and this omission necessitates remand. *See Halloran*, 362 F.3d at 32–331;

34

*Snell*, 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citing *Schaal*, 134 F.3d at 505).

The Commissioner nevertheless argues that inconsistencies in Dr. Taveras's opinion ultimately justify the ALJ's assignment of less weight to his opinion. Specifically, the Commissioner contends that Dr. Taveras's "unremarkable" treatment notes undermine his marked and extreme assessments of Vasquez's mental health in his medical source statement. Def. Mem. at 20. Under *Cichocki v. Astrue*, the ALJ's assignment of less weight to the treating physician's medical source statement is justified when it conflicts with his treatment notes. 534 F.3d 71, 76 (2d Cir. 2013). In *Cichocki*, however, the ALJ specifically noted the inconsistency in his opinion. *Cichocki v. Astrue*, No. 11-CV-755S (WMS), 2012 WL 3096428, at *6 (W.D.N.Y. July 30, 2012). Here, the ALJ never determined that Dr. Taveras's treatment notes were inconsistent with his medical source statement. R. at 43. While it is certainly possible that, upon remand, the ALJ will make such a determination, the issue the Commissioner raises does not negate the need for further review.

### b.   The ALJ Failed to Identify and Weigh Dr. Getaneh's Opinion as That of a Treating Physician

A separate defect in the ALJ's decision is his failure to identify Dr. Getaneh as a treating physician and subsequent failure to afford his medical opinion controlling weight in the RFC analysis at step four. According to SSA regulations, a treating source has greater weight once he has examined the claimant "a number of times and long enough to have obtained a longitudinal picture of [the alleged] impairment." 20 C.F.R. § 404.1527(c)(2)(i). There is no minimum period of treatment by a physician before this standard is met. In fact, courts have held that "SSA adjudicators [should] focus on the nature of the ongoing physician-treatment relationship, rather than its length." *Sanchez v. Colvin*, No. 13-CV-6303 (PAE), 2015 WL 736102, at *4 (S.D.N.Y.

Feb. 20, 2015) (citing *Schisler v. Bowen*, 851 F.2d 43, 45 (2d Cir. 1988) (upholding draft Social Security Ruling clarifying that treating physician's "ongoing" relationship with claimant may be "of a short time span")); *see also Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) ("The nature – not the length – of the [physician-patient] relationship is controlling."); *Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir. 1990) (applying treating physician rule where doctor saw patient for only three months).

Dr. Getaneh treated Vasquez for the atrophy of his right arm and referred Vasquez to other specialists for further treatment and testing from July 27, 2009 through November 9, 2011. R. at 345-74. In his Disability Report Appeal Form, Vasquez refers to both Dr. Taveras and Dr. Getaneh (misspelled "Guetany") as his treating physicians. *Id.* at 226. Dr. Getaneh even wrote a brief note confirming Vasquez's impairments and recommending all necessary assistance be extended to Vasquez. *Id.* at 407. The evidence indicates that the nature of Dr. Getaneh's relationship with Vasquez was sufficiently central to Vasquez's right arm treatment that the ALJ should have considered him as a treating physician. Thus, the ALJ should have given his opinion controlling weight (or less weight if the record so dictated) and made specific findings to that effect. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(2); *Burgess*, 537 F.3d at 128; *Halloran*, 362 F.3d at 32. But when weighing the opinions of Vasquez's treating physicians against the consultative physicians, the ALJ did not evaluate Dr. Getaneh's opinion at all, even though he would have been the only treating physician who could have specifically provided details as to the deterioration of Vasquez's right arm. R. at 41-43.

Although ALJs have "the authority to weigh various medical opinions and choose between them," *Scott*, 2010 WL 2736879, at *16 (internal quotation marks omitted), here the ALJ's failure to appropriately develop the record with respect to the opinions of Drs. Taveras

and Getaneh as treating physicians led him to render a decision based on an incomplete record. *See, e.g., id.* at \*13-14 (remanding where the ALJ failed to seek out treating physician's report and seek clarification about ambiguities from other doctors); *Toribio v. Astrue*, No. 06-CV-6532 (NGG), 2009 WL 2366766, at \*10 (E.D.N.Y. July 31, 2009) (remanding case, in part, for ALJ's failure to seek clarification from treating physician as to an ambiguity in report on claimant's disability status). With such gaps in the administrative record, a remand is necessary to fully develop the medical evidence in Vasquez's case. *See, e.g., Rosa*, 168 F.3d at 82–83 (citing *Pratts*, 94 F.3d at 39). As a result of these errors at step four, the Court orders that Vasquez's case be remanded back to the ALJ. [21]

## 3. Vasquez's Submissions to the Appeals Council Should be Considered Upon Remand

After the ALJ's decision, the Appeals Council determined that none of Vasquez's new submissions by Mary Claire Arbilo, Dr. Rostanski, and Dr. Taveras attesting to his disability provided a basis for changing the ALJ's decision because these submissions commented on a "later time" after the ALJ decision. R. at 2. The Commissioner contends that under *Perez v. Chater*, the Appeals Council was correct because it must consider new evidence only where it relates to the period on or before the date of the ALJ's hearing. 77 F.3d 41 (2d Cir. 1996). Therefore, the Commissioner argues Vasquez's new submissions cannot serve as a basis for remanding the ALJ's decision. The Court need not address these arguments. Because this case is remanded for further development of the record, the ALJ should assess this new evidence in order to review Vasquez's claims on a complete record. *See* 42 U.S.C.A. § 405(g); *McClain*, 299

---

[21] "Although a remand request is normally made by a party, there is no reason why a court may not order the remand *sua sponte*." *Armstrong v. Colvin*, No. 12-CV-8126 (VB) (PED), 2013 WL 6246491, at \*2 n.1 (S.D.N.Y. Dec. 3, 2013) (quoting *Clark v. Callahan*, No. 96-CV-3020 (SAS), 1998 WL 512956, at \*1 (S.D.N.Y. Aug. 17, 1998)).

37

F. Supp. 2d at 311 (noting that on a previous remand, the ALJ considered new evidence); *Tunstall v. Schweiker*, 511 F. Supp. 470, 475 (E.D. Pa. 1981) (stating that if the Secretary's decision is not supported by substantial evidence, a full and fair hearing requires consideration of new evidence submitted to the Appeals Council).

### III. CONCLUSION

For the reasons stated herein, the Court denies the Commissioner's motion for judgment on the pleadings, and remands the case to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). Specifically, on remand, the ALJ should:

(1) Reevaluate the weight accorded to Dr. Taveras's opinion with the understanding that, in his capacity as a psychiatrist, he will be able to discuss how Vasquez's feelings about his right arm condition may impact his mental health;

(2) Evaluate Dr. Getaneh's opinion as that of a treating physician and determine the appropriate weight to be given to that opinion;

(3) Reevaluate Vasquez's credibility based on an accurate characterization of the nature of his treatment and further development of the record; and

(4) Consider Vasquez's submissions to the Appeals Council.

The Clerk of the Court is respectfully directed to close the motion at docket entry 11.

### SO ORDERED.

Dated: New York, New York
July 20, 2015

JAMES L. COTT
United States Magistrate Judge

38

**A copy of this Order has been mailed to the following:**

**Adriano Vasquez**
20 Richman Plaza, Apt 1K
Bronx, NY 10453